(61 Misc. Rep. 150.)

SACKETT & WILHELMS LITHOGRAPHING & PRINTING CO. et al. v. NATIONAL ASS'N OF EMPLOYING LITHOGRAPHERS et al.

WERTHER RAUSCH CO. et al. v. SAME.

(Supreme Court, Special Term, New York County. November 12, 1908.)

1. INJUNCTION (§ 129*)—NECESSITY FOR RELIEF—TERMINATION—DECISION OF CONTROVERSY.

Where, after the commencement of certain actions to enjoin a negotiation of notes, they were negotiated, but were afterwards returned to the defendant, whereupon complainants asked for a decree dismissing the complaints, the question on which complainants' original relief depended would be determined to ascertain complainants' liability for costs and on their injunction bonds.

[Ed. Note.—For other cases, see Injunction, Cent. Dig. §§ 279, 283; Dec. Dig. § 129.*]

2. WORDS AND PHRASES—"OPEN SHOP"—"CLOSED SHOP."

The term "open shop" has a distinctive trade meaning, and, in reference to trade matters, means that, in selecting employés, there shall be no discrimination between union and nonunion men. The "open shop" means nonrecognition of unions as such, and excludes the idea of discrimination against men because of their membership in a union. The moment they are discriminated against with reference to their employment, the shop pursuing such policy becomes a closed shop.

3. ASSOCIATIONS (§ 5*)—EMPLOYERS' ASSOCIATION—CONSTITUTION—RULES.

The constitution of an association employing lithographers provided that, before any hostile action on the part of any union to any member of the association, it favored the arbitration of disputes; and that, in the event of hostile action by a trade union toward a member, the "open shop" should be established with reference to such hostile union. Held, that where, after a strike, the association adopted a resolution prohibiting any member from employing until further order of the directors any workman who retained his membership in certain designated unions in the trade, it in effect established a closed shop for the members of the association, and not an open one, in violation of the constitution, and was therefore illegal.

[Ed. Note.—For other cases, see Associations, Dec. Dig. § 5.*]

4. ASSOCIATIONS (§ 13*)—MEMBERS—FORFEITURES—INJUNCTION.

Where members of an employers' association agreed to abide by the association's constitution, by-laws, and regulations of its board of directors, and secured performance by depositing undated notes which the association was authorized to treat as a forfeiture for disobedience, a member was entitled to restrain the negotiation of its notes as a forfeit because of an alleged disobedience of an unlawful regulation.

[Ed. Note.—For other cases, see Associations. Dec. Dig. § 13.*]

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

Suits by the Sackett & Wilhelms Lithographing & Printing Company and another, and by the Werther Rausch Company and others, against the National Association of Employing Lithographers and others.  Complaints dismissed.

Smith & Martin (Newell Martin, J. Aspinwall Hodge, and Louis Dean Speir, of counsel), for plaintiffs.

Wile & Oviatt (Charles E. Rushmore and Henry Root Stearn, of counsel), for defendants.

SEABURY, J.  These actions were originally brought to enjoin the defendants from negotiating, indorsing, or otherwise transferring certain promissory notes, and for a decree directing that the notes be delivered up and canceled.  The notes were made and delivered undated by the plaintiffs to the defendant.  The defendant is a domestic corporation organized under the membership corporation law (Laws 1895, p. 329, c. 559), and. as its name indicates, is composed of employing lithographers.  Its ostensible objects are set forth in the certificate of incorporation and in the preamble of its constitution.  The preamble sets forth that the object of the association "shall be to foster the business of lithographers, to reform abuses relative thereto and to secure freedom from unjust and unlawful exactions, to produce uniformity and certainty in the customs and usages of the trade, to settle differences between its members, to promote a more enlarged and friendly intercourse between lithographers, to maintain amicable relations between the members and their employés, to prevent unjust and unreasonable discrimination against any person or persons by any combination, person or conspiracy in any matter relating to the business of the members of the association, and in general to foster and advance the industrial progress of the lithographic trade."  It also declares that the association shall adhere to the following principles: (1) Prior to the commission of hostile action on the part of any union to any member of the association, it favors the settlement or arbitration of disputes with trade unions.  (2) In the event of hostile action by a trade union towards a member of the association, the "open shop" is to be established with reference to such hostile union.  Section 1 of article 1 provides as follows:

"The members of this corporation shall be restricted to such persons as are engaged individually, or are members of firms or are stockholders in corporations which are engaged in the business of lithographing, and own and operate lithographic power presses.  No applicant shall be admitted to membership in this corporation who, as an individual or whose firm or corporation has any agreement with any labor union in the lithographic trade."

The constitution of the association provides that each incorporating member pay into the treasurer a membership fee in an amount to be fixed by the board of directors to be computed at the rate of $500 for each lithographic power press operated by the member, or firm or corporation which such member represents.  Article 2, § 1, of Constitution.  Before election to membership, Bunker signed an application, in which he agreed to abide by the constitution and by-laws of the association and the rules and regulations of the board of directors.  Sackett & Wilhelms Lithographing & Printing Company,

the plaintiffs in one of these actions, signed an agreement that Bunker
would fulfill all the promises and obligations which he undertook to
perform.   The board of directors of Sackett & Wilhelms Lithograph-
ing & Printing Company passed a resolution that it was the opinion
of such board that the welfare of their company "would be advanced
and its business interests protected by representation through one of
its stockholders in the National Association of Employing Lithograph-
ers," and authorizing Bunker to obtain membership in the association,
and empowering its treasurer to indorse any note which the association
might require in payment of his membership fee.   The authorization
is as follows:

"It being understood that the undersigned Harold Bunker is indebted to
the National Association of Employing Lithographers in the amount of $11,-
500, and said association being willing to accept a note representing said in-
debtedness," etc.

The Werther Rausch Company was represented in the association
by William Werther, and similar documents were executed by that
corporation and its representative.

The defendant association was organized in May, 1906.   The notes
of the plaintiffs were given on or about June 4, 1906.   In the following
July and August, labor troubles occurred in the lithographic trade, and
on August 2d a strike was begun against all corporations represented
in the association.   In July, when the unions demanded an eight-hour
day, the board of directors of the defendant association declared by
resolution that such demand was a hostile act on the part of the unions,
and declared that the "open shop" was in effect.   When a conference
between representatives of the unions and the association was unable
to arrive at an amicable settlement, a strike was begun by the unions
of lithographic employés against all firms and corporations represented
in the defendant association.   On September 21st, the board of direct-
ors of the association passed a resolution requiring that its members
should not employ union men.   This resolution is as follows:

"Whereas, the National Association of Employing Lithographers have de-
clared the open shop in respect to such unions as by refusing arbitration and
by striking have seriously endangered the welfare of the lithographic indus-
try, and whereas for nearly eight weeks the strikers have had the opportu-
nity to return to work, and have refused to do so, and have rejected and re-
pudiated the open shop, and whereas thirty-five per cent. of the presses of the
country struck August 2d are now running under present conditions, and
whereas the restriction of output being removed from said presses, they show
a material increase in production:   Now, therefore, be it resolved, by the
board of directors of the National Association of Employing Lithographers
that in order to maintain the conditions which have been established by the
members of this association, and in order to prevent the control of the indus-
try from again drifting into union hands, no member of this National Asso-
ciation of Employing Lithographers shall take back, until further order of the
board of directors, any workman who retains his membership in the Lithog-
raphers' International Protective and Beneficial Association of the United
States and Canada, the Lithographic Artists', Engravers' and Designers'
League of America, the International Association of Lithographic Apprentices
and Press Feeders of the United States and Canada, and the Lithographic
Stone and Plate Preparers' Association of the United States and Canada."

When the defendant association adopted the resolution of Septem-
ber 21st, prohibiting the employment of union men, the plaintiffs made

no objection; but subsequently they requested the board of directors to return to the "open shop" principle, and suggested that the offices of the Civic Federation be accepted in attempting to submit to arbitration the dispute between the association and the unions. The defendants refused to arbitrate, at this time, upon the ground that their previous offer to arbitrate had been declined, and that they had expended large sums to establish the position of the association, and that, as those efforts were now about to be successful, it would be unfair to require them to arbitrate. The defendants insisted, however, that the resolution prohibiting the employment of union men was merely a temporary measure, and that it would be subsequently repealed. Before the repeal of this resolution, the plaintiffs employed union men, in violation of the resolution of the board of directors of the association.

On March 15, 1907, an order was granted in these actions requiring the defendant to show cause why it should not be enjoined from dating or negotiating the plaintiffs' notes. The motion was argued April 8th, and, owing to a technical defect in the motion papers, the original order was vacated. On April 8th another order to show cause was obtained, and this was vacated on the morning of April 9th, because no order had been entered upon the decision vacating the first order to show cause. A few hours later, in the same day, another order was signed, which restored the original injunction order. In the few hours, intervening between the vacation of the order to show cause and the signing of the last order to show cause, the defendant dated the notes three months from date and negotiated them with the Yorkville Bank.

Although the original purpose of these actions was to enjoin the negotiation of the notes, and they have since been negotiated, the plaintiffs now ask that the court make a decree dismissing the complaints in these actions, on the ground that although the plaintiffs had a cause of action and had the right to an injunction at the time these actions were begun, yet at the present time such relief is unnecessary, since the notes are not now in the hands of an innocent purchaser for value, but are held by the defendants. The liability of the plaintiffs upon the undertaking which they gave when the original injunction was obtained and their liability for the costs of these actions are dependent upon the question whether, if the status of the case at the time of the trial had been identical with that existing at the time the original injunction was obtained, the plaintiffs would be entitled to the relief which they originally sought. It is necessary therefore, notwithstanding that the status of the case has undergone a change, that the court should determine the question originally presented. Williams v. Montgomery, 148 N. Y. 519, 43 N. E. 57; Kelley v. McMahon, 37 Hun, 212; Brown v. Utopia Land Co., 118 App. Div. 190, 103 N. Y. Supp. 53.

The resolution of September 21st attempted to establish the "closed shop." A resolution by an employers' association, which forbids the employment of union men, like a resolution by a union or federation of unions which forbids the employment of nonunion men, establishes

a "closed shop." Indeed, it is not denied by the counsel for the defendant that the resolution of September 21st did temporarily establish the "closed shop." It is therefore necessary to determine whether the resolution of September 21st was lawful. The broader question as to whether a "closed shop" is lawful or unlawful is not presented for determination. The question in dispute here is simply whether, under the constitution of the defendant, the resolution of September 21st was lawful. It is evident from the constitution that the defendant was organized to observe and adhere to two fundamental principles. In the first place, when no hostile action had been taken by any union against it or its members, it was to observe the principle of conference and arbitration in reference to any controversy which arose. In the second place, when hostile action had been taken by any union against it or its members, it was to establish the "open shop" with reference to such hostile union or unions. The defendant was by its constitution obligated to adhere to the principle of arbitration when no hostile action had been taken by a union, and when such hostile action had been taken it was obliged to establish the "open shop" with reference to such union.

The term "open shop" has a distinctive trade meaning, and, in reference to trade matters, means that in selecting employés there shall be no discrimination against union or nonunion men. The counsel for the defendant declares that "the 'open shop' simply means nonrecognition of the unions as such." This definition is quite correct as far as it goes, but it does not go far enough. The term "open shop" excludes the idea of discrimination against men because of their membership in a union. The moment men are discriminated against with reference to their employment, because they are union men, the shop pursuing this policy becomes a "closed shop." The principle of an "open shop" is that in it men are employed regardless of whether they are union or nonunion. This is the sense in which the term "open shop" is invariably used, and it is with this meaning in mind that the defendant must be presumed to have used it in its constitution. It cannot be that, under a provision of the defendant's constitution, requiring the directors to establish an "open shop" in the event of hostile action by a union, the direction can be so interpreted as to authorize the directors to establish a "closed shop." The defendant cannot be presumed to have intended to declare in its constitution its adherence to the principle of the "open shop" and to conform its practice to the principle of the "closed shop." To argue that such was in fact its intention is to convict it of obvious insincerity. Nor is the argument tenable which urges that the declaration in favor of an "open shop" was not intended to limit the powers of the directors. While broad powers are conferred by the constitution upon the board of directors, the powers so conferred were granted to enable them to carry out the purpose for which the defendant corporation was organized. Upon this point, the constitution is very specific. It declares (article 3, § 5) that:

"The board of directors shall manage the property and affairs of this corporation, and shall have absolute and complete power to do any and all acts in furtherance of the purposes and objects of this corporation."

Under such a grant of power, the board of directors cannot claim authority to do anything foreign to the purposes and objects of the defendant corporation. The purpose and object of the association, in the event of hostile action by any union, is clearly declared to be to establish the "open shop." No reasonable construction can interpret this provision of the constitution to mean that, in the event of hostile action, the board of directors are authorized to do the very opposite thing from that which they are specifically enjoined to do and sanction the establishment of a "closed shop." I can see no escape from the conclusion that the resolution of September 21st, which established a "closed shop," was in direct violation of the defendant's constitution and therefore invalid. In my view of this case, the question as to whether the defendant, by virtue of the resolution of September 21st, acted in restraint of trade, is not involved, as the resolution itself was illegal because it was in violation of the defendant's constitution.

It is true, I think, as stated by counsel, that the present tendency of industry, in this country, is to assume the form of collective bargaining. It is also true that, in order for collective bargaining to be effective, each contracting party must be permitted to exercise a certain measure of control or disciplinary power over the units of which they are severally composed. Such control and power are essential in order to make it possible for employers' associations and unions or a federation of unions to collectively contract with one another in reference to trade matters; but in making such agreements, and in attempting to limit or prescribe the actions of the units of which each are composed, it is plain that each entity, whether it be an employers' association or a federation of unions, must conform to its own constitution. Each contracting party has wide powers in compelling the obedience of its own members to its lawful regulations, but neither can compel its members to obey resolutions contrary to the express terms of its own constitution. This is not a case where the plaintiffs violated a lawful regulation or rule of the association of which they were members. As members of the defendant association, the plaintiffs had the right to insist that, in the event of any union committing an act which the board of directors deemed hostile, the "open shop" should be established. In work of the character required to be done in the lithographic trade, skilled and competent workmen were essential, and the freedom of every member of the defendant association to employ union men was a substantial right. It was especially valuable in this case, as the evidence shows that it was very difficult to obtain skilled and competent workmen for work required in the lithographic trade who were not union men. I am satisfied that the notes, to restrain the negotiation of which these actions were originally brought, while nominally given in payment of membership fees, were in fact given as a penalty or forfeit to be dated and collected in the event of disobedience to the rules and resolutions of the defendant. That such was the true character of the notes is sufficiently shown by the evidence. In the course of a letter which one of the officers of the

defendant addressed to an employing lithographer to induce it to join the association, it is stated that:

"This association is not a gentlemen's agreement, but is one in which bonds are put up which are forfeited if the houses do not comply with the constitution of the association."

No "bonds" were required by the constitution, and the reference to requiring "bonds" which may be "forfeited" clearly applies to the notes which members gave and which were ostensibly given as "membership fees." While a court of equity might well refuse to restrain the negotiation of notes given to secure obedience to lawful resolutions and rules (City Trust & Safe Deposit & S. Co. v. Waldhauer, 47 Misc. Rep. 7, 95 N. Y. Supp. 222; McCord v. Thompson-Starrett Co., 112 N. Y. Supp. 902), the claim that it cannot restrain their negotiation when an attempt is made to treat them as a forfeit because the plaintiffs disobeyed an unlawful regulation is untenable.

At the time of the commencement of this action, the plaintiffs had a cause of action against the defendant and had the right to an injunction.

As such relief is now unnecessary, and in conformity to the prayer of the plaintiffs, the complaints are dismissed.